**Darrel SCHMITZ, Respondent,**

v.

**UNITED STATES STEEL CORPORATION, Appellant.**

**No. A12–0709.**

Court of Appeals of Minnesota.

May 13, 2013.

---

Michelle Dye Neumann, Phillip M. Kitzer, Halunen & Associates, Minneapolis, MN, for respondent.

Douglas R. Christensen, Marilyn Clark, Dorsey & Whitney LLP, Minneapolis, MN; and Rodney M. Torbic (pro hac vice), United States Steel Corporation, Pittsburgh, PA, for appellant.

Considered and decided by HUDSON, Presiding Judge; STONEBURNER, Judge; and KIRK, Judge.

## OPINION

HUDSON, Judge.

Following a court trial, appellant U.S. Steel challenges the district court's judgment awarding respondent Darrel Schmitz $15,000 in damages, as well as reasonable attorney fees and costs, for threatening to discharge Schmitz for seeking workers' compensation benefits in violation of Minn. Stat. § 176.82, subd. 1, but finding for U.S. Steel on Schmitz's retaliatory-discharge and refusal-to-offer-continued-employment claims brought under Minn.Stat. § 176.82, subds. 1, 2. U.S. Steel argues that the district court erred (1) in holding U.S. Steel liable for threatening to discharge Schmitz in violation of Minn.Stat. § 176.82, subd. 1; (2) in concluding that the employer's conduct does not have to be cruel or venal for a plaintiff to recover on a threat-to-discharge claim; (3) by declining to analyze Schmitz's threat-to-discharge claim using the *McDonnell Douglas* burden-shifting framework; (4) by not allowing U.S. Steel to assert a *Faragher–Ellerth* affirmative defense to liability for supervisor wrongdoing; and (5) in awarding respondent $203,112.50 in attorney fees. In his cross-appeal, Schmitz argues that the district court denied his constitutional right to a jury trial and clearly erred by finding for U.S. Steel on his retaliatory-discharge claim.

Because Minn.Stat. § 176.82, subd. 1, provides a cause of action for threatening to discharge an employee for seeking workers' compensation benefits, and because the district court did not err in concluding that U.S. Steel violated the statute, we affirm the district court's judgment on that claim. Additionally, because a claim alleging retaliatory discharge in violation of Minn.Stat. § 176.82, subd. 1, seeking only money damages, sounds in tort and is therefore an action at law with an attendant right to a jury trial under the Minnesota Constitution, we reverse the district court's judgment on that claim and remand for a jury trial. Finally, we affirm the district court's judgment for U.S. Steel on Schmitz's refusal-to-offer-continued-employment claim under Minn.Stat. § 176.82, subd. 2, because Schmitz was not entitled to a jury trial on that claim.

## FACTS

Plaintiff Darrel Schmitz was employed by U.S. Steel as a maintenance mechanic at its iron-ore facility in Keewatin. In October 2006, Schmitz worked on the "mill crew" and was supervised by Michael Bakk, who in turn was supervised by Larry Sutherland, the facility's area manager.

On October 23, 2006, Schmitz allegedly injured his back at work. Schmitz claims that he reported the injury to Bakk and went home after his shift. Schmitz did not file an accident report that day; filing an accident report is the first step in filing a workers' compensation claim.

The next morning, October 24, 2006, Schmitz called Bakk to tell him that his back and side felt strange, but because of the noise in the facility, Bakk could not hear Schmitz and informed Schmitz that he would call him back later. Later that day, Bakk and Sutherland called Schmitz at home. According to Schmitz, Sutherland informed Schmitz that U.S. Steel would take a "very dim view" of Schmitz if he were to file an accident report. Schmitz testified that he then asked Suth-

erland, "What are they going to do, fire me?" Schmitz testified that Sutherland responded, "Without having to perjure [myself], yes." Schmitz testified that this conversation led him to believe that he would be fired if he filed an accident report.

Later on October 24, Schmitz had a doctor's appointment regarding his back. The physician's notes from that visit state, "51-year old presents with lower back discomfort and pain with some spasm since last evening around 10 o'clock when he was moving a heavy object at work. Patient adamantly refuses to put this under workman's comp because of other issues that have been going on there." U.S. Steel provided Schmitz with accommodations when he returned to work on October 26, 2006, with no medical restrictions placed upon his work-related duties. Schmitz never filed an accident report concerning his October 23, 2006 injury.

Schmitz injured his back at home on December 28, 2006. Schmitz was unable to return to work following that injury, and was placed on paid sickness and accident leave. In April 2007 he filed a workers' compensation claim, asserting that his inability to work resulted from his October 23, 2006 workplace injury. The claim was denied one year later on multiple grounds, one of which was Schmitz's failure to provide notice to U.S. Steel of his injury. After undergoing back surgery, in October 2007 Schmitz was authorized to return to light-duty work with several activity restrictions. No position was found for him, however, and Schmitz has not worked at U.S. Steel since January 2007.

In May 2008, Schmitz filed a complaint asserting claims of (a) retaliatory discharge for seeking workers' compensation benefits in violation of Minn.Stat. § 176.82, subd. 1, (b) refusing to offer continued employment in violation of Minn.Stat.

§ 176.82, subd. 2, and (c) disability discrimination in violation of the Minnesota Human Rights Act (MHRA), Minn.Stat. §§ 363A.01–.41 (2006). The district court granted U.S. Steel's motion for summary judgment on all claims in February 2010. In December 2010, this court reversed the district court regarding Schmitz's claims under section 176.82. *Schmitz v. U.S. Steel Corp.*, No. A10–633, 2010 WL 4941668 (Minn.App. Dec. 7, 2010). This court noted that "[a]ppellant has not raised a claim that Sutherland's threat, by itself, constitutes a per se violation of the workers' compensation laws resulting in respondent's liability," but the statute explicitly prohibits threatening to discharge an employee for seeking workers' compensation benefits. *Id.* at *7. This court held that the alleged threat was evidence of retaliation that, in conjunction with other evidence on the record, could lead a rational fact-finder to conclude that Schmitz was discharged in retaliation for seeking workers' compensation benefits. *Id.* at *7–8.

Upon remand, U.S. Steel moved to quash Schmitz's demand for a jury trial, and the district court granted this motion. The district court also granted Schmitz's motion to amend the complaint to add a claim for threatening to discharge an employee for seeking workers' compensation in violation of Minn.Stat. § 176.82, subd. 1.

Following a three-day bench trial, the district court entered judgment for Schmitz on his threat-to-discharge claim, awarding $15,000 in emotional-distress damages, plus reasonable attorney fees and costs. The district court rejected Schmitz's retaliatory-discharge and refusal-to-offer-continued-employment claims, finding that Schmitz's activity restrictions frustrated U.S. Steel's ability to find a position for Schmitz after his injury.

U.S. Steel filed a motion to amend findings or for a new trial, and Schmitz filed a

motion for attorney fees and costs. U.S. Steel argued that (1) the district court should not have recognized a separate cause of action under Minn.Stat. § 176.82, subd. 1, for threatening to discharge an employee for seeking workers' compensation benefits; (2) U.S. Steel was entitled to assert a *Faragher/Ellerth* affirmative defense to liability for the wrongdoing of a supervisor; (3) the district court should have applied the *McDonnell Douglas* burden-shifting framework to Schmitz's threat-to-discharge claim; and (4) Schmitz did not prove that U.S. Steel's conduct was cruel or venal. The district court denied U.S. Steel's motion.

The district court granted in part Schmitz's motion for attorney fees, awarding $203,112.50 in attorney fees, $100,000 less than Schmitz requested, and $9,448.58 in costs. This appeal follows.

## ISSUES

I. Did the district court err by concluding that Minn.Stat. § 176.82, subd. 1, provides a cause of action for threatening to discharge an employee for seeking workers' compensation benefits that is independent of claims for retaliatory discharge and intentional obstruction of benefits?

II. Was Schmitz required to prove that U.S. Steel's conduct was "cruel or venal" to succeed on his threat-to-discharge claim?

III. Did the district court err by failing to analyze Schmitz's threat-to-discharge claim using the *McDonnell Douglas* burden-shifting framework?

IV. Was U.S. Steel entitled to assert a *Faragher/Ellerth* affirmative defense to defeat vicarious liability for a supervisor's alleged threat to discharge Schmitz for seeking workers' compensation benefits?

V. Did the district court err in determining that U.S. Steel violated Minn.Stat.

§ 176.82, subd. 1, by threatening to discharge Schmitz for seeking workers' compensation benefits?

VI. Under the Minnesota Constitution, was Schmitz entitled to a jury trial on his retaliatory-discharge and refusal-to-offer-continued-employment claims brought under Minn.Stat. § 176.82?

## ANALYSIS

### I

U.S. Steel argues that the district court erred by concluding that Minn.Stat. § 176.82, subd. 1, part of the Minnesota Workers' Compensation Act (WCA), Minn. Stat. §§ 176.001–.862 (2012), provides a cause of action for threatening to discharge an employee for seeking workers' compensation benefits independent of claims for retaliatory discharge and intentional obstruction of benefits. The issue requires us to interpret Minn.Stat. § 176.82, subd. 1, which is a legal determination that we review de novo. *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 836 (Minn.2012).

The goal of statutory interpretation is to "ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2012); *accord Brayton v. Pawlenty*, 781 N.W.2d 357, 363 (Minn.2010). If the language of the statute is clear and unambiguous, the court's role is to enforce the language of the statute and not explore the spirit or purpose of the law. Minn.Stat. § 645.16. If a statute is ambiguous, we use other canons of construction to discern the legislature's intent. *Brua v. Minn. Joint Underwriting Ass'n*, 778 N.W.2d 294, 300 (Minn.2010). When appellate courts have previously interpreted a statute, that interpretation should guide subsequent disputes over the meaning of the statute. *Caldas*, 820 N.W.2d at 836. "Specifically, judicial construction of a statute becomes

part of the statute as though written therein." *Id.* (citing *Sandal v. Tallman Oil Co.,* 298 Minn. 264, 268, 214 N.W.2d 691, 693 (1974)).

## A

Minnesota Statutes section 176.82, subdivision 1, states:

> Any person discharging or *threatening to discharge* an employee for seeking workers' compensation benefits or in any manner intentionally obstructing an employee seeking workers' compensation benefits is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits caused by a violation of this section including costs and reasonable attorney fees, and for punitive damages not to exceed three times the amount of any compensation benefit to which the employee is entitled. Damages awarded under this section shall not be offset by any workers' compensation benefits to which the employee is entitled.

*Id.* (emphasis added).

 The statute proscribes three forms of conduct: discharging an employee for seeking workers' compensation benefits; threatening to discharge an employee for seeking benefits; and intentionally obstructing an employee seeking benefits. As the parties acknowledge, there is extensive caselaw regarding claims for retaliatory discharge and intentionally obstructing an employee seeking benefits, but no published or unpublished case deals directly with a claim for threatening to discharge an employee for seeking workers' compensation benefits. Despite the lack of caselaw, the unambiguous language of the statute provides that a person may be held liable for threatening to discharge an employee for seeking workers' compensation benefits. *See* Minn.Stat. § 645.16. We

therefore conclude that Minn.Stat. § 176.82, subd. 1, provides a cause of action for threatening to discharge an employee for seeking workers' compensation benefits that is independent of claims for retaliatory discharge and intentional obstruction of benefits.

## B

Having determined that a cause of action exists, we must next determine the scope of that claim and the requisite elements. Our analysis cannot be done in a vacuum, because the cause of action we recognize today springs from a specific statutory provision that is part of the broader workers' compensation system. We are mindful, therefore, that "[t]he workers' compensation system in Minnesota is based on a mutual renunciation of common law rights and defenses by employers and employees alike." Minn.Stat. § 176.001. The employee's right to sue for damages caused by a workplace injury is limited by the WCA, as is the employer's right to raise certain defenses such as contributory negligence. *Id.* As a result, "[i]t is the specific intent of the legislature that ... the common law rule of 'liberal construction' based on the supposed 'remedial' basis of workers' compensation legislation shall not apply in such cases." *Id.* In deference to the mandate of exclusivity, section 176.82 is to be interpreted narrowly. *See Flaherty v. Lindsay,* 467 N.W.2d 30, 33 (Minn.1991); *Bergeson v. U.S. Fid. & Guar. Co.,* 414 N.W.2d 724, 727 (Minn. 1987).

With these parameters in mind, we begin by analyzing cases construing the closely related cause of action for intentional obstruction of workers' compensation benefits in violation of Minn.Stat. § 176.82, subd. 1. *See Caldas,* 820 N.W.2d at 836 (stating that previous interpretations of a statute should guide subsequent

interpretations). The Minnesota Supreme Court first recognized the civil action for intentional obstruction of workers' compensation benefits in *Kaluza v. Home Ins. Co.*, 403 N.W.2d 230 (Minn.1987), relying upon *Black's Law Dictionary* and the Restatement (Second) of Torts to define the plain language of the statute. *Kaluza*, 403 N.W.2d at 233–34. The supreme court noted in *Bergeson* that other sections of the WCA imposed penalties for unreasonably delaying benefits. *Bergeson*, 414 N.W.2d at 726–27 (citing Minn.Stat. § 176.225, subd. 1 (1986)). The court concluded that the civil action was therefore "intended to cover those situations where the insurer's delay or denial of benefits goes beyond unreasonableness, neglect, or obstinance." *Id.* at 727. The cause of action was defined as arising "where a person, such as an insurer, obstructs or hinders, whether by deliberate action or inaction, the receipt of benefits due the injured worker and does so in a manner that is outrageous and extreme, or, to put it another way, in a manner which is egregiously cruel or venal." *Id.*

In *Flaherty*, the Minnesota Supreme Court considered whether a plaintiff could recover for intentional obstruction after an employer took several actions to obstruct the receipt of benefits, but the receipt of benefits was not actually disrupted. 467 N.W.2d at 32. The supreme court held that a "plain reading of the statute ... suggests some actual denial or disruption in the receipt of benefits must occur to warrant recovery." *Id.* The court rejected plaintiff's argument that the statute covers an attempt to obstruct benefits, noting that deference to the mandate of exclusivity requires a narrow construction of the statute. *Id.* at 33. "[A]llowing a civil action for *any* wrongdoing by the employer would shatter the exclusivity principle." *Id.*

We glean two key principles from the supreme court's analysis in *Bergeson* and *Flaherty:* that the statute is not intended to impose strict liability for all employer wrongdoing, and that the statute should be narrowly construed. Guided by these principles, our next task is to interpret the statutory language at hand to determine the elements of the cause of action for threatening to discharge an employee for seeking workers' compensation benefits.

The statute provides that "[a]ny person discharging or threatening to discharge an employee for seeking workers' compensation benefits ... is liable in a civil action for damages incurred by the employee including any diminution in workers' compensation benefits." Minn.Stat. § 176.82, subd. 1.

**Potential Defendants—"Any person"**

■ A defendant may be an individual, an insurance carrier, or an employer, because insurance carriers and employers are included within the definition of "person" under section 176.82. *Summers v. R & D Agency, Inc.*, 593 N.W.2d 241, 244 (Minn.App.1999).

**"Seeking"**

■ The statute prohibits threatening to discharge an employee "for seeking" workers' compensation benefits. To seek is defined as "[t]o endeavor to obtain." *The American Heritage Dictionary of the English Language* 1633 (3d ed. 1996). It is not necessary under the plain language of the statute for the employee to have already filed for workers' compensation, only that the threat is made to an employee who is perceived to be endeavoring to obtain workers' compensation benefits. Given that insurers (or employers, if they self-insure, as U.S. Steel has acknowledged that it does) are strictly liable for workplace injuries under the WCA, once a workplace injury occurs, it is certain to

both the employer and the employee that any resulting lost wages and medical benefits will be covered by workers' compensation. Accordingly, *any* employee who has suffered a workplace injury may be perceived to be "seeking workers' compensation benefits." We therefore conclude that once the party that allegedly issued the threat becomes aware that an employee has suffered a workplace injury, the employee is "seeking" workers' compensation benefits for purposes of a threat-to-discharge claim under Minn.Stat. § 176.82, subd. 1.

This interpretation is consistent with the purpose of the statute: to "provide a cause of action for an employee when an employer or insurance carrier used threats or coercion to discourage or prevent an employee from pursuing a claim for workers' compensation." *Furrer v. Campbell's Soup Co.*, 403 N.W.2d 658, 660 (Minn.App. 1987), *review denied* (Minn. May 28, 1987). The workers' compensation scheme "would be seriously undermined if employers may threaten to discharge employees for seeking benefits under the act because many employees would give up their work[ers]' compensation claims in order to avoid jeopardizing their job[s]." *Rettinger v. Am. Can Co.*, 574 F.Supp. 306, 310 (M.D.Pa.1983) (quotation omitted). "This result would effectively relieve the employer of the responsibilities expressly placed upon it by the Work[ers]' Compensation Act." *Id.*

#### "Threatening to discharge"

The next question is what constitutes "threatening to discharge an employee." *See* Minn.Stat. § 176.82, subd. 1. A threat is defined as "[a] communicated intent to inflict harm or loss on another." *Black's Law Dictionary* 1519 (8th ed. 2004). To threaten is "to project to another person potential or even imminent harm." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 893 (3d ed. 2011). "To threaten is to try to influence by creating an expectation of punishment to be carried out against . . . anyone who disobeys or otherwise behaves objectionably." *Id.* As opposed to menacing an individual, which primarily seeks to cause alarm, the primary purpose of threatening someone is to influence that individual's behavior. *Id.*

Because a threat is a "communicated intent" to take a certain action if the threatened person does not conform his or her behavior to a desired standard, we must also determine what intent requirement should be imposed, and how the requisite intent is to be measured. It does not appear relevant whether the speaker actually intends to discharge the employee should the employee seek benefits, because the point of making a threat is to influence behavior without having to follow through on the threat. There are three logical constructions—one would focus solely on the effect of the threatening communication upon the employee, which would effectively negate an intent requirement; a second approach would look solely at the intent of the speaker; and a third approach would require the speaker to have a particular intent when making the communication, while also requiring the communication to have a particular effect on the employee. We consider each in turn.

#### *The effect on the employee*

The effect on the employee could be measured subjectively, assessing whether the employee actually believed that there was a risk of being discharged. Or it could be measured objectively: whether a reasonable employee would interpret the statements as meaning that his or her job would be jeopardized by pursuing a workers' compensation claim. Or the subjective and objective standards could be combined, as is the case in the context of the

intentional tort of assault, by asking whether the words or threats were "such as to cause plaintiff reasonable apprehension of" being discharged. *See Dahlin v. Fraser*, 206 Minn. 476, 478, 288 N.W. 851, 852 (1939). Under that standard, the plaintiff must have had apprehension of being discharged and it must have been objectively reasonable. The most narrow construction would be to require that the employee not only feel threatened but also be deterred in some way, either by not filing a claim, delaying filing a claim, or taking some other action to the detriment of recovering benefits.

### The intent of the speaker

While it is not, in our view, consistent with the purpose of the statute or the definition of a threat to require that the speaker intended to discharge the employee, it would be consistent with a narrow construction to require that the speaker intended to dissuade the employee from seeking workers' compensation by intimating that such action would jeopardize employment. As is the case in a number of contexts, "[i]ntent may be inferred from all the facts and circumstances.... Where intent is deemed an essential ingredient, the party charged with [the proscribed conduct] may testify as to the intent with which he committed the act, although his testimony is not conclusive." *Dahlin*, 206 Minn. at 478, 288 N.W. at 853. Relevant circumstances would include the conduct, language, and potential motivations of the speaker as well as the context in which the alleged threat was made. This is a question for the fact-finder if the plaintiff has presented sufficient facts to give rise to a reasonable inference that the party issuing the alleged threat intended to dissuade the plaintiff from pursuing a workers' compensation claim.

### The intent of the speaker and the effect on the employee

Because section 176.82 is to be narrowly construed, and given the purpose of the statute, we conclude that the third approach—requiring proof of the intent of the speaker and the effect on the employee—best effectuates the intent of the statute. The legal meaning of "threaten" provides that the person making the threat is intending to influence the employee. Garner, *supra*, at 893. And for a threat to be actionable, the person who was threatened should have been actually afraid of losing his or her job, or there is no logical basis for finding mental distress or any other form of damages. We therefore conclude that the communication(s) allegedly comprising the threat must have been intended to dissuade the employee from seeking benefits, and the threat must have caused reasonable apprehension of discharge were the employee to seek workers' compensation benefits.

We must also consider whether the statute requires that the threat affected the behavior of the employee by deterring or delaying the employee from seeking benefits. On the one hand, it would go beyond the plain language of the statute to require that the employee's behavior be affected in some way, such as by delaying filing of the claim. How a listener responds to a threat does not negate or establish the existence of a threat, only whether the threat was effective. Yet the same could be said of the term "intentionally obstructing"—according to its plain meaning, the statute would apply whenever an employer interferes with an employee's efforts to receive workers' compensation benefits—yet the supreme court has required that for an "intentional obstruction" to be actionable, "some actual denial or disruption in the receipt of benefits must occur to warrant recovery." *Flaherty*, 467 N.W.2d at 32.

Given the purpose of the statute, to prevent employers from using coercion to prevent employees from seeking benefits, and given the supreme court's caution that "allowing a civil action for any wrongdoing by the employer" under Minn.Stat. § 176.82 "would shatter the exclusivity principle," it appears reasonable to require that the employee be deterred or delayed from filing the claim as a result of the threat. *See id.* at 33.

■ Yet it would defeat the purpose of the statute to require proof that the threat resulted in an actual loss of benefits, as it would transform a claim for "threatening to discharge" an employee into another form of an intentional-obstruction-of-benefits claim, rendering the language of the statute superfluous. *See Am. Family Ins. Grp. v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) ("A statute should be interpreted, whenever possible, to give effect to all its provisions; no word, phrase, or sentence should be deemed superfluous, void, or insignificant." (quotation omitted)). Accordingly, rather than require an actual loss of benefits, or proof that the employee was or would have been eligible for benefits, we conclude that an employee need only show that the employee delayed or ceased seeking workers' compensation benefits as a result of the threat.

■ To summarize, we hold that a claim for threatening to discharge an employee for seeking workers' compensation benefits in violation of Minn.Stat. § 176.82, subd. 1, requires the plaintiff to show that: (1) a person with knowledge that the plaintiff suffered a workplace injury; (2) attempted to dissuade the plaintiff from seeking workers' compensation benefits through one or more communications; (3) the communication(s) created a reasonable apprehension of discharge; and (4) as a result, the plaintiff delayed or ceased seeking workers' compensation benefits.

## II

■ U.S. Steel argues that, to recover on a threat-to-discharge claim, the plaintiff must demonstrate "cruel or venal" conduct on behalf of the defendant. The district court rejected this argument, stating that such a requirement is not supported by either the statute or caselaw. We agree.

The "cruel or venal" standard applies to intentional-obstruction-of-benefit claims brought under Minn.Stat. § 176.82, subd. 1. *Bergeson,* 414 N.W.2d at 727. In imposing this standard, the supreme court noted that Minn.Stat. § 176.225, subd. 1 (1986), authorizes an additional award to a claimant of up to 25%[1] of the total compensation award where the employer or insurer has opposed the claim on frivolous grounds, unreasonably delayed payment, intentionally underpaid compensation, or neglected or refused to pay compensation. *Id.* at 726. The court observed that because section 176.225 "usually will provide an appropriate remedy for loss sustained by an insurer's foot-dragging or neglect," claims under section 176.82 are "intended to cover those situations where the insurer's delay or denial of benefits goes beyond unreasonableness, neglect or obstinance." *Id.* at 726–27. Therefore to keep the remedies of sections 176.82 and 176.225 "separate and distinguishable," the supreme court limited recovery to instances where the employer or insurer obstructs the receipt of benefits "in a manner that is outrageous or extreme, or, to put it another

---

**1.** In 1995, Minn.Stat. § 176.225, subd. 1, was amended to allow an additional award of up to 30 percent of the compensation award. 1995 Minn. Laws ch. 231, art. 2, § 87, at 2062. An employer guilty of inexcusable delay in making payments is liable for an additional penalty equal to 25 percent of the payments found to be delayed. *Id.,* § 88.

way, in a manner which is egregiously cruel or venal." *Id.* at 727.

This rationale is inapplicable to a threat-to-discharge claim. U.S. Steel points to no provision within the WCA providing a remedy for an employee who has been threatened with discharge other than the remedy contained within section 176.82. There is therefore no statutory justification for imposing a "cruel or venal" standard to distinguish the civil action from an administrative remedy.

U.S. Steel argues that the "cruel or venal" standard has been applied in several retaliatory-discharge cases to require proof of outrageous conduct, but the cases cited by U.S. Steel are either taken out of context or simply do not support its argument. In *Markgraf v. Douglas Corp.*, 468 N.W.2d 80 (Minn.App.1991), although the plaintiff appears to have raised a retaliatory-discharge claim, the "cruel or venal" standard was applied only to her claim of intentional obstruction of workers' compensation benefits. *Id.* at 82. And in *Miller v. CertainTeed Corp.*, 971 F.2d 167, 171 (8th Cir.1992) and *Back v. Danka Corp.*, 335 F.3d 790, 792–93 (8th Cir.2003), the retaliatory-discharge claim was dismissed because the plaintiff failed to produce sufficient evidence to show a causal connection between seeking workers' compensation benefits and termination. U.S. Steel's argument that these cases illustrate an outrageous-conduct requirement for retaliatory-discharge claims under section 176.82 is unpersuasive—in each case the plaintiff would have succeeded by simply showing that he was terminated for seeking workers' compensation benefits, as prohibited by the plain language of the statute.

Furthermore, imposing a "cruel or venal" standard would not advance the purpose of the statute—to prevent employers from using coercion or threats to dissuade injured employees from seeking workers' compensation benefits. The concern of the statute is not with how severe or outrageous a particular threat might be, but whether it deters an employee from filing a claim. Indeed, it is often the most insidious or seemingly benign threats that are the most effective. Thus, unlike the intentional-obstruction-of-benefits context, where the existence of additional remedies favors reserving the civil remedy for particularly outrageous behavior, advancing the purpose of the statute here requires punishing threats whenever they have delayed or deterred an employee from filing a claim. The district court therefore did not err by refusing to require a demonstration of "cruel or venal" conduct on the part of the defendant.

### III

U.S. Steel argues that the district court erred by not analyzing Schmitz's threat-to-discharge claim under the *McDonnell Douglas* burden-shifting framework used for retaliatory discharge claims under Minn.Stat. § 176.82, subd. 1. *See Snesrud v. Instant Web, Inc.*, 484 N.W.2d 423, 427 (Minn.App.1992), *review denied* (Minn. June 17, 1992). Under the *McDonnell Douglas* framework, an employee alleging retaliatory discharge must first make out a prima facie case consisting of three elements: (1) statutorily protected conduct by the employee; (2) adverse employment action by the employer, and (3) a causal connection between the two. *Kunferman v. Ford Motor Co.*, 112 F.3d 962, 965 (8th Cir.1997). The burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Benson v. Nw. Airlines, Inc.*, 561 N.W.2d 530, 539 (Minn.App.1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). If the employer meets that bur-

den of production, the burden shifts back to the employee to demonstrate that the employer's stated reason for its action was more likely than not pretextual. *Id.*

U.S. Steel argues that this analytical framework should apply to a threat-to-discharge claim. Under U.S. Steel's rubric, a prima facie case would require a showing that the employee engaged in a protected activity, i.e., seeking benefits, and suffered an adverse action, i.e., being deterred from seeking benefits or being discharged. The employer could then proffer a legitimate reason for its actions, and the employee must attempt to show that the proffered reason was pretextual.

■ The district court rejected this argument because Minnesota caselaw imposes no such requirement for a threat-to-discharge claim. The district court also stated that the burden-shifting framework is ill-suited for analyzing a threat-to-discharge claim. We agree. Unlike the retaliatory-discharge context, in which the employee suffers an adverse employment action, such as discharge or demotion, for which there may have been a legitimate reason, it is never permissible to deter an injured employee from seeking workers' compensation benefits. Furthermore, the Minnesota Supreme Court has recognized that a plaintiff need not prove a statutory violation using the *McDonnell Douglas* burden-shifting framework when, as here, the plaintiff attempts to prove the violation using direct evidence. *Hoover v. Norwest Private Mortg. Banking,* 632 N.W.2d 534, 542 (Minn.2001). We conclude that a district court is not required to analyze claims for threatening to discharge an employee in violation of Minn.Stat. § 176.82, subd. 1, using the *McDonnell Douglas* burden-shifting framework. Accordingly, the district court did not err in refusing to do so here.

## IV

■ U.S. Steel next argues that the district court erred by not allowing it to assert an affirmative defense to wrongdoing by a supervisor, known as the *Faragher/Ellerth* defense. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

■ The *Faragher/Ellerth* defense, which has been applied to hostile-environment cases under the MHRA and Title VII, applies in cases where a hostile environment was "created by a supervisor with immediate (or successively higher) authority over a victimized employee." *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2292–93; *Frieler v. Carlson Mktg. Grp.,* 751 N.W.2d 558, 570 (Minn.2008) (permitting assertion of the *Faragher/Ellerth* defense in MHRA hostile-environment cases). In circumstances where no tangible employment action has been taken against the employee, the employer may raise an affirmative defense to liability if it proves by a preponderance of the evidence: (1) "that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher,* 524 U.S. at 807, 118 S.Ct. at 2293.

U.S. Steel argues that it should have been allowed to assert such a defense against Schmitz's threat-to-discharge claim, because the threat was made by Sutherland, a supervisor with immediate (or successively higher) authority over Schmitz, and there is no evidence that U.S. Steel had actual or constructive knowledge that Sutherland made the threat. The

district court held that U.S. Steel could not assert a *Faragher/Ellerth* affirmative defense in the absence of statutory language or caselaw permitting the defense under Minn.Stat. § 176.82. We agree.

As an initial matter, we note that there is no statutory requirement that an employee report the wrongdoing or pursue administrative remedies before bringing suit under Minn.Stat. § 176.82. Where determination of a section 176.82 claim "does not require interpretation of a collective bargaining agreement, ... Minnesota law does not require the employee to exhaust contractual remedies before bringing the civil suit." *McDaniel v. United Hardware Distrib. Co.*, 469 N.W.2d 84, 88 (Minn.1991). Thus Schmitz's alleged failure "to take advantage of any preventive or corrective opportunities" by reporting Sutherland's threat to U.S. Steel or his union does not preclude recovery under section 176.82. *Ellerth*, 524 U.S. at 765, 118 S.Ct. at 2270; *Faragher*, 524 U.S. at 807, 118 S.Ct. at 2293.

Furthermore, the history of the *Faragher/Ellerth* defense demonstrates why it is not appropriate in this context. The central question in *Faragher* was whether an employer may be held vicariously liable for the actions of a supervisor, when the employer had no actual or constructive knowledge of the harassing behavior. The Eleventh Circuit concluded that while the sexual harassment was sufficiently severe and pervasive to create a hostile work environment, (1) the two supervisors were not acting within the scope of their employment when they engaged in the harassment, (2) the supervisors were not aided in their actions by the agency relationship, and (3) the city had no constructive knowledge of the harassment simply because it was pervasive or known to plaintiff's third supervisor. *Faragher*, 524 U.S. at 783–84, 118 S.Ct. at 2281.

The Supreme Court agreed and held that because a "master is subject to liability for the torts of his servants committed while acting in the scope of their employment," and because harassment falls under the traditional category of "frolic," well outside the scope of an employee's duties, the employer should not be automatically held liable for sexual harassment by a supervisor. *Id.* at 793, 798, 799, 118 S.Ct. at 2286, 2288, 2289 (quoting Restatement (Second) of Agency § 219(1) (1958)).

The Court then turned to section 219(2)(d) of the Restatement, which provides that "a master is not subject to liability for the torts of his servants acting outside the scope of their employment unless ... the servant ... was aided in accomplishing the tort by the existence of the agency relation." *Id.* at 801, 118 S.Ct. at 2290 (quoting Restatement (Second) of Agency § 219(2)(d)). The Supreme Court held that, because a supervisor's harassment is often enabled by the harasser's supervisory authority over the victim—authority the employer has provided to the supervisor—the aided-by-agency principle requires that employers be held liable for harassment in some cases. *Id.* at 802, 118 S.Ct. at 2290. The Supreme Court concluded that an employer can mitigate its role in aiding the harasser by providing a "proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense." *Id.* at 806–07, 118 S.Ct. at 2292.

The *Faragher/Ellerth* defense therefore provides a means for the employer to avoid liability arising from its role in facilitating commission of an intentional tort by providing supervisory authority to a harasser who uses that authority to commit acts outside the scope of employment of which the employer had no knowledge. Therefore, under the agency principles laid out

in both *Faragher* and *Ellerth,* an employer may escape vicarious liability for the torts of its employees only if the employee/tortfeasor is acting outside the scope of employment.

 Unlike sexual harassment, the proscribed conduct here falls directly within a supervisor's scope of employment. In Minnesota, "an employer is vicariously liable for an employee's intentional tortious acts when: (1) the tort is related to the employee's duties; and (2) the tort occurs within work-related limits of time and place." *Hagen v. Burmeister & Assocs., Inc.,* 633 N.W.2d 497, 504 (Minn.2001). Under the WCA, an employee who has suffered an injury is required to provide notice of the injury to his employer. Minn.Stat. § 176.141. Knowledge of an injury obtained by a supervisor is imputed to the employer. *Sobczyk v. City of Duluth,* 245 Minn. 569, 572, 73 N.W.2d 795, 798 (1955) (stating that "the law is well settled that knowledge of the occurrence of an injury to an employee gained by a foreman or superintendent is imputed to the employer"); *Ogren v. City of Duluth,* 219 Minn. 555, 557–58, 18 N.W.2d 535, 537 (1945) (holding that "[a]ctual knowledge by an officer or agent standing in the employer's place . . . is actual knowledge of the employer"). Because a supervisor's knowledge of an injury is imputed to the employer, and because a supervisor will naturally be among the first to learn of a workplace injury, learning of, processing, and responding to possible workplace injuries falls squarely within the scope of a supervisor's employment.[2]

Furthermore, because we impute a supervisor's knowledge of an injury to the employer, by extension, a supervisor's tortious act of threatening to discharge an employee for seeking workers' compensation benefits should be imputed to the employer. There is no legal basis under principles of agency law for permitting an employer to assert a *Faragher/Ellerth* affirmative defense to escape liability for a supervisor's actions in violation of Minn. Stat. § 176.82, subd. 1.

## V

 U.S. Steel argues that, even if Minn.Stat. § 176.82, subd. 1, provides an independent cause of action for threatening to discharge an employee for seeking workers' compensation benefits, the district court's findings of fact did not support its legal conclusion that U.S. Steel violated the statute. We disagree.

As discussed in part I.B, to prove a claim for threatening to discharge an employee for seeking workers' compensation benefits in violation of Minn.Stat. § 176.82, subd. 1, a plaintiff must show that: (1) a person with knowledge that the plaintiff may have suffered a workplace injury; (2) attempted to dissuade the plaintiff from seeking workers' compensation benefits through one or more communications; (3) the communication(s) created a reasonable apprehension of termination; and (4) as a result, the plaintiff delayed or ceased seeking workers' compensation benefits. Although the district court did not analyze Schmitz's claim within this framework, the district court's findings of fact are sufficiently detailed to allow us to analyze whether Schmitz satisfied each element.

The first element is satisfied, as the district court found that on October 23,

---

**2.** U.S. Steel appears to argue that Sutherland could not have been acting within the scope of his employment by allegedly threatening Schmitz because he was violating U.S. Steel's policy prohibiting such threats. This argument lacks merit, as "conduct is not outside the scope of employment merely because an employee disregards the employer's instructions." Restatement (Third) of Agency § 7.07 cmt. c (2006).

2006, Schmitz informed Bakk, his supervisor, that he suffered a workplace injury, and that Bakk then conveyed this information to Sutherland, the facility's area manager and the person accused of issuing the threat. Next, the district court found that Sutherland informed Schmitz that his job would be in jeopardy if he filed for workers' compensation with the intent to dissuade him from reporting the injury or pursuing a claim, thus satisfying the second element. Although the district court found that Sutherland may have been acting out of concern for Schmitz and his future employment, regardless of Sutherland's motivations, the purpose of the communication was to discourage Schmitz from seeking workers' compensation benefits. Third, the district court explicitly found that Sutherland's communications caused Schmitz to fear that he would lose his job if he reported a workplace injury, and also found that this fear was reasonable. Finally, the district court implicitly found that Schmitz did not file an accident report with his supervisor or allow his physician to characterize the injury as a workplace injury, out of fear for his employment. Because reporting the workplace injury is the first step in filing a workers' compensation claim, these findings demonstrate that Schmitz was delayed or deterred from seeking workers' compensation benefits as a result of the threat. The record amply supports all of the district court's findings and the existence of all four elements of a threat-to-discharge claim.

Because the four required elements are satisfied, we conclude as a matter of law that U.S. Steel violated Minn.Stat. § 176.82, subd. 1, by threatening to discharge Schmitz for seeking workers' compensation benefits. We therefore affirm the district court's judgment on that claim.

## VI

■■■■ In his cross-appeal, Schmitz argues that the district court erred in quashing his demand for a jury trial. Whether the Minnesota Constitution provides a right to a jury trial for a particular cause of action is a legal question that is reviewed de novo. *United Prairie Bank–Mountain Lake v. Haugen Nutrition & Equip., LLC,* 813 N.W.2d 49, 53 (Minn. 2012). Denial of the right to a jury trial constitutes reversible error. *Landgraf v. Ellsworth,* 267 Minn. 323, 326, 126 N.W.2d 766, 768 (1964).

■■■■ Schmitz's claims arise under the WCA, which does not specifically provide for the right to a jury trial. "[S]o that right, if it exists, must arise under the constitution." *Abraham v. Cnty. of Hennepin,* 639 N.W.2d 342, 348 (Minn.2002).[3] Article I, section 4, of the Minnesota Constitution states that "[t]he right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy." Minn. Const. art. I, § 4. "This provision is intended to continue, unimpaired and inviolate, the right to trial by jury as it existed in the Territory of Minnesota when [the Minnesota Constitution] was adopted in 1857." *Abraham,* 639 N.W.2d at 348. "A party is

3. Though the WCA places limitations upon whether an action may be heard by a jury, *see* Minn.Stat. § 176.301, this limitation applies only to cases presenting a "workers' compensation issue," defined as an issue that "determines whether [the employee] is entitled to workers' compensation for his injuries." *Advanced Delivery Sys., Inc. v. Jaime,* 774 N.W.2d 176, 177 (Minn.App.2009). Thus while the WCA does not provide for the right to a jury trial, it does not prohibit claims brought under Minn.Stat. § 176.82 from being heard by a jury. *See* Minn.Stat. § 176.82, subd. 1, 2 (providing that persons engaging in proscribed conduct may be held "liable in a civil action").

therefore constitutionally entitled to a trial by jury 'if a party raising that same theory for relief at the time the Minnesota Constitution was adopted also would have been entitled to a jury trial.'" *United Prairie Bank*, 813 N.W.2d at 53 (quoting *Olson v. Synergistic Techs. Bus. Sys., Inc.*, 628 N.W.2d 142, 149 (Minn.2001)). But "if that same type of action did not entitle a party to a jury trial at the time the Minnesota Constitution was adopted," then no right to a jury trial is recognized today. *Olson*, 628 N.W.2d at 149.

 Though the right to a jury trial is framed in the context of causes of action at law when the Minnesota Constitution was enacted, "Article I, section 4 does not freeze the right to a jury trial to only those causes of action that existed in 1857." *United Prairie Bank*, 813 N.W.2d at 53. To determine whether the right to a jury trial exists, we analyze "current causes of action and pleading practices in the context of the theories of relief . . . and the jurisprudence" at the time of the Minnesota Constitution's enactment. *Id.* at 53–54; *see also Olson*, 628 N.W.2d at 149. Thus we focus not on whether the exact cause of action existed in 1857, but on the *type* of action—whether the claim is an action at law, for which the constitution guarantees a right to a jury trial, or an equitable action, for which there is no constitutional guarantee of a jury trial. *United Prairie Bank*, 813 N.W.2d at 54; *Rognrud v. Zubert*, 282 Minn. 430, 433–34, 165 N.W.2d 244, 247 (1969).

 The right to a jury trial therefore depends upon "[t]he nature and character of the controversy, as determined from all the pleadings and by the relief sought." *Abraham*, 639 N.W.2d at 349. We engage in a two-part analysis to determine the nature and character of the controversy. First, we consider the substance of the claim based upon the pleadings and the underlying elements of the claim. *United Prairie Bank*, 813 N.W.2d at 54; *Abraham*, 639 N.W.2d at 350. We then consider the "nature of the relief sought." *Abraham*, 639 N.W.2d at. 353. Where a party seeks equitable relief, the action is equitable in nature, and there is no right to a jury trial. *Morton Brick & Tile Co. v. Sodergren*, 130 Minn. 252, 255, 153 N.W. 527, 528 (1915). However "the mere fact that monetary relief is sought does not automatically create a right to a jury trial." *Olson*, 628 N.W.2d at 154. When the plaintiff seeks both equitable and legal relief as part of a single cause of action, the action is not strictly legal in nature, and neither party is entitled to a jury trial. *Indianhead Truck Line, Inc. v. Hvidsten Transp., Inc.*, 268 Minn. 176, 194, 128 N.W.2d 334, 347 (1964); *Koeper v. Town of Louisville*, 109 Minn. 519, 522, 124 N.W. 218, 218–19 (1910).

When the district court granted U.S. Steel's motion to quash Schmitz's demand for a jury trial, the complaint contained two claims: retaliatory discharge and refusal to offer continued employment. We will consider each claim in turn to determine whether it entitled Schmitz to a jury trial.[4] Though denial of the right to a jury

4. The district court's order quashing Schmitz's demand for a jury trial was entered prior to entry of its order granting Schmitz's motion to amend the complaint to add the threat-to-discharge claim. Although Schmitz's threat-to-discharge claim may have been tried by a jury had the motion to quash been denied, neither party has asked us to consider whether Schmitz was entitled to a

jury trial on that claim, nor has either party asked for relief from that portion of the district court's order, should we conclude that Schmitz's retaliatory-discharge and refusal-to-offer-continued-employment claims carried the right to a jury trial. We therefore decline to consider the issue. *See* Minn. R. Civ.App. P. 128.02, subd. 1(e) (stating that appellant's brief must state the "precise relief sought");

trial constitutes reversible error, we will only reverse the district court's judgment on those claims for which Schmitz was entitled to a jury trial. *See Storms v. Schneider*, 802 N.W.2d 824, 829 (Minn. App.2011) ("If an action includes both legal and equitable issues, the legal issues are triable by a jury and the equitable issues by the court.") (quotation omitted), *review denied* (Minn. Oct. 26, 2011); *Koeper*, 109 Minn. at 521–22, 124 N.W. at 218 (stating the general rule that "[i]n mixed actions, based on both a legal and an equitable cause of action, a party has a constitutional right ... to a trial by a jury of the legal cause of action").

## A

Schmitz's first claim alleged that his employment was terminated in retaliation for seeking workers' compensation benefits. Claims for retaliatory discharge "are a species of the common law action of wrongful discharge." *Abraham*, 639 N.W.2d at 350. Dating back as early as 1861, wrongful-discharge cases were brought under a breach-of-contract theory and sought legal remedies in the form of money damages. *Id.* at 350–51. "As contract actions brought in a court of law for money damages, claims for wrongful discharge were causes of action at law, and they were consequently tried to juries." *Id.* at 351.

The cause of action could no longer be brought under a breach-of-contract theory after 1936, when the Minnesota Supreme Court recognized that, absent an employment contract, the employment relationship may be terminated at will by either the employer or employee. *Skagerberg v. Blandin Paper Co.*, 197 Minn. 291, 294–95, 266 N.W. 872, 873–74 (1936). In 1986, this court recognized an exception to the at-will employment doctrine when an employee proves that a discharge "violates a clear mandate of public policy." *Phipps v. Clark Oil & Ref. Corp.*, 396 N.W.2d 588, 592 (Minn.App.1986). While passage of the Minnesota Whistleblower Act, 1987 Minn. Laws ch. 76, § 2, mooted the policy question posed by the case, the supreme court recognized more narrowly a cause of action for an employee who is discharged for refusing to violate the law. *Phipps v. Clark Oil & Ref. Corp.*, 408 N.W.2d 569, 571 (Minn.1987).

The supreme court has since acknowledged that "[a] wrongful discharge claim sounds in tort." *Abraham*, 639 N.W.2d at 352. While section 176.82 obviated the need for Minnesota courts to consider the issue, a number of jurisdictions have recognized the common law tort of retaliatory discharge for filing a workers' compensation claim.[5] *See Jean

Minn. R. Civ.App. P. 131.01, subd. 5(d)(2) (applying requirements of rule 128.02, subdivision 1, to cross-appellants); *Hoyt Inv. Co. v. Bloomington Commerce & Trade Ctr. Assocs.*, 418 N.W.2d 173, 175–76 (Minn.1988) (noting that respondents seeking a particular disposition in the event an appeal is successful have an obligation to articulate that position in their appellate briefing).

5. *See, e.g., Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 384 N.E.2d 353, 356–58 (1978); *Frampton v. Central Indiana Gas Co.*, 260 Ind. 249, 297 N.E.2d 425, 428 (1973) (holding that employees terminated for filing

a workers' compensation claim should be "fully compensated in damages" for the employer's "intentional, wrongful act"); *Murphy v. City of Topeka*, 6 Kan.App.2d 488, 630 P.2d 186, 190, 193 (1981) (recognizing common law cause of action for retaliatory discharge for filing workers' compensation claim and holding that the claim "sounds in tort"); *Phillips v. Butterball Farms Co., Inc.*, 448 Mich. 239, 531 N.W.2d 144, 147 (1995) (holding that the common law action for wrongful discharge in retaliation for filing a workers' compensation claim "sounds in tort" given that the right against retaliatory discharge "does not stem from any term agreed upon by

C. Love, *Retaliatory Discharge for Filing a Workers' Compensation Claim: The Development of a Modern Tort Action,* 37 Hastings L.J. 551, 554–55 (1986). An employee discharged in retaliation for filing a workers' compensation claim has a right to consequential money damages in an action brought in district court. *See* Minn.Stat. § 176.82. A tort action seeking money damages in a district court is an action at law. *See Abraham,* 639 N.W.2d at 353; *Tyroll v. Private Label Chems.,* 505 N.W.2d 54, 57, 61–62 (Minn.1993). The substance and elements of the claim lead us to conclude that a retaliatory-discharge claim under Minn.Stat. § 176.82, subd. 1, is an action at law. And because Schmitz's retaliatory-discharge claim tracked the language of the statute, alleging that U.S. Steel terminated him in retaliation for seeking workers' compensation benefits, we conclude that the substance of Schmitz's claim is legal in nature.

We next consider the nature of the relief sought. *United Prairie Bank,* 813 N.W.2d at 56. U.S. Steel argues that Schmitz is not entitled to a jury trial because the complaint sought equitable relief. The original complaint sought a declaratory judgment that U.S. Steel's practices violate the laws prohibiting discrimination and retaliation in Minnesota; a permanent injunction requiring U.S. Steel to adopt employment practices in conformity with Minnesota law; and reinstatement of Schmitz or, in the alternative, front pay and benefits he would have been entitled to as an employee. This does not end our inquiry, however, because we look at the pleadings as a

whole to determine the nature of the controversy. *Landgraf,* 267 Minn. at 327, 126 N.W.2d at 768; *Swanson v. Alworth,* 168 Minn. 84, 90, 209 N.W. 907, 909 (1926) (holding that although a complaint often determines whether a plaintiff is entitled to a jury trial, if the complaint does not accurately reflect the nature of the dispute, it "does not then control").

U.S. Steel raised this argument in its motion to quash Schmitz's demand for a jury trial. In response to the motion to quash, Schmitz argued that the equitable relief sought in the complaint related only to his claims under the MHRA, and that he sought only monetary relief after the dismissal of his MHRA claim was affirmed. In addition, Schmitz offered to amend his complaint pursuant to Minn. R. Civ. P. 15.01 to remove all demands for equitable relief. This proved unnecessary; the district court's order quashing Schmitz's request for a jury trial made no mention of the demands for equitable relief. And after the bench trial concluded, Schmitz submitted proposed findings of fact and conclusions of law that sought only monetary damages.

Reviewing the pleadings as a whole, we conclude that Schmitz's retaliatory-discharge claim under Minn.Stat. § 176.82, subd. 1, sought only money damages. Our conclusion is supported by the contrasting forms of relief available under the respective statutes. While the MHRA provides for extensive equitable relief, section 176.82 only allows recovery of money damages. *Compare* Minn.Stat. § 363A.29, subd. 5 (2012) (authorizing the court to order reinstatement or promotion of a ter-

the contracting parties"); *Hansen v. Harrah's,* 100 Nev. 60, 675 P.2d 394, 397 (1984); *Lally v. Copygraphics,* 85 N.J. 668, 428 A.2d 1317, 1318 (1981); *Brown v. Transcon Lines,* 284 Or. 597, 588 P.2d 1087, 1094–95 (1978); *Shick v. Shirey,* 552 Pa. 590, 716 A.2d 1231,

1238 (1998); *Clanton v. Cain–Sloan Co.,* 677 S.W.2d 441, 445 (Tenn.1984) (interpreting workers' compensation statute as permitting retaliatory-discharge claim); *Shanholtz v. Monongahela Power Co.,* 165 W.Va. 305, 270 S.E.2d 178, 182 (1980).

minated plaintiff who has suffered employment discrimination) *with* Minn.Stat. § 176.82 (allowing plaintiffs to recover consequential damages, punitive damages, costs, and reasonable attorney fees). Here, the pleadings reveal that the request for equitable relief within the complaint pertained only to Schmitz's MHRA claim, which had been dismissed by the time of trial; the nature of the relief sought was therefore consistent with an action at law.

■ Having analyzed both the substance of the claim and the relief sought, as determined by all of the pleadings, we conclude that an action brought in district court under Minn.Stat. § 176.82, subd. 1, alleging the tort of retaliatory discharge and seeking only money damages, is an action at law for which the Minnesota Constitution guarantees the right to a jury trial.

**B**

The second claim for which Schmitz demanded a jury trial in the original complaint alleged refusal to offer continued employment in violation of Minn.Stat. § 176.82, subd. 2, which states that "[a]n employer who, without reasonable cause, refuses to offer continued employment to its employee when employment is available within the employee's physical limitations shall be liable in a civil action for one year's wages." *Id.* The statute directs that the continuation of the business of the employer, seniority, and the provisions in a collective bargaining agreement should all be considered in determining the availability of employment. *Id.*

This cause of action relates to an employer's obligation under the WCA to provide vocational rehabilitation services to an injured worker that are "intended to restore the injured employee so the employee may return to a job related to the employee's former employment or to a job in another work area which produces an economic status as close as possible to that the employee would have enjoyed without disability." Minn.Stat. § 176.102, subd. 1(b). As part of an employee's rehabilitation, employers are to pay for the services of a qualified rehabilitation consultant to develop a rehabilitation plan designed "to assist in return to work" by providing services such as retraining. Minn.Stat. § 176.102, subds. 4(a), 9(a)(1)–(6), 11. As an extension of the provisions requiring the employer to provide services to help the employee return to work, section 176.82, subdivision 2, requires the employer to continue to employ that worker when there are jobs available that the worker is able to perform.

We conclude that the substance of this claim is equitable in nature, and therefore not the "type of action" that "entitle[d] a party to a jury trial at the time the Minnesota Constitution was adopted." *Olson,* 628 N.W.2d at 149. By requiring consideration of the employee's physical limitations, continuance of the business of the employer, rules of seniority, and any collective bargaining agreement, the statute is essentially asking the finder of fact to make an equitable determination of whether the employer should have offered continued employment to the employee. *See* Minn.Stat. § 176.82, subd. 2. The statute establishes no legal standard to determine when any of these factors might relieve an employer of the obligation to offer continued employment, as one would typically find in an action at law. For example, a court being asked to preserve the status quo by excusing nonperformance due to economic impracticability in a breach-of-contract case, an action at law, must determine whether a specific legal standard is satisfied: whether performance would impose an "excessive or unreasonably burdensome hardship" caused "by

a circumstance not only unanticipated but inconsistent with the facts which the parties obviously assumed as likely to continue" when the contract was formed. *Powers v. Siats*, 244 Minn. 515, 520–21, 70 N.W.2d 344, 348 (1955). But a court being asked to preserve the status quo and prevent irreparable economic hardship by exercising its equitable power to issue a temporary injunction has no specific legal standard that must be satisfied; the court instead "evaluate[s] the situation in light of five considerations" such as the relationship between the parties and public policy. *See Dahlberg Bros. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965).

We also note that the cause of action is not analogous to a breach-of-contract claim, because it does not arise from a contract between the parties. Furthermore, the language of the statute does not punish termination of employment, but the refusal to *offer* continued employment, implicitly recognizing that the statute does not presuppose a contractual relationship between the parties.

Nor is the action analogous to any common law tort. While a party may have an affirmative duty to protect a party from injury if there is a special relationship between the parties, *see Bjerke v. Johnson*, 742 N.W.2d 660, 664–65 (Minn.2007), in the employment context, this duty arises only where an employee, "acting within the scope of his employment, comes into a position of imminent danger of serious harm." Restatement (Second) of Torts § 314B (1965). In our view, the duty to protect an employee from imminent danger is not analogous to a statutory duty to find suitable employment for a previously-injured employee.

▪ Finally, we consider the nature of the relief sought. Though the nature of the relief sought here is monetary, "the mere fact that monetary relief is sought does not automatically create a right to a jury trial." *Olson*, 628 N.W.2d at 154. The "key question" is whether the cause of action is "legal in nature and character." *Id.* We conclude that the nature of this cause of action is equitable and is not the type of action entitling a party to a jury trial when the Minnesota Constitution was enacted; therefore, a claim for refusal to offer continued employment brought under Minn.Stat. § 176.82, subd. 2, does not carry a constitutional right a jury trial.

### C

While our conclusions are based on the substance of each claim and the relief sought, we recognize that the district court did not analyze these factors in denying Schmitz a jury trial. Thus, we turn now to addressing the district court's analysis. The district court articulated three lines of reasoning to support its conclusion that Schmitz was not entitled to a jury trial. First, the district court held that when new rights and remedies are created by statute, the right to a jury trial can only be conferred by the legislature. Second, the district court held that the outcome was controlled by specific precedent holding that there is no right to a jury trial for actions brought pursuant to Minn.Stat. § 176.82. Third, the district court reasoned that actions under the WCA do not carry a constitutional right to a jury trial, because the act is premised on the mutual renunciation of common law rights. We reject each line of reasoning.

First, the district court relied upon *Breimhorst v. Beckman*, 227 Minn. 409, 433–34, 35 N.W.2d 719, 734 (1949), for the proposition that where new rights or remedies are created that were unknown at common law, "the giving or withholding of a jury trial is a legislative privilege," and therefore absent a legislative decree grant-

ing the right to a jury trial, a statutorily created cause of action confers no right to a jury trial. *Id.* But this reasoning was directly called into question by the supreme court in *Abraham.* "We did not hold in *Breimhorst* that the legislature could deny the constitutional right to jury trial when it codifies, creates, or modifies a cause of action at law." *Abraham,* 639 N.W.2d at 354. *Abraham* also limited the supreme court's decision in *Ewert v. City of Winthrop,* 278 N.W.2d 545, 550 (Minn. 1979), which held that a party appealing a special assessment had no right to a jury trial because there is no common law right to appeal a special assessment. "We did not hold in *Ewert* that all statutory causes of action are equitable actions with no right to jury trial. When a statutory cause of action is legal in nature . . . there is a constitutional right to jury trial." *Abraham,* 639 N.W.2d at 354. The *Abraham* court concluded, "we clarify today that the right to a jury trial applies to all causes of action at law, regardless of whether the legislature has codified the cause of action." *Id.*

Two cases illustrate this principle. In *Tyroll v. Private Label Chems., Inc.,* 505 N.W.2d 54 (Minn.1993), the Minnesota Supreme Court held that a party to an employer-insurer's subrogation claim for benefits paid, brought after settlement of an employee's underlying negligence suit, is entitled to a jury trial. *Id.* at 57. Even though "the [WCA] gives the employer-insurer the right to intervene and maintain the action as a subrogee," the "nature and character of the controversy" of the action was that of a "routine negligence personal injury action" for which the Minnesota Constitution guarantees a jury trial. *Id.* In *Abraham,* the supreme court held that an employee alleging retaliatory discharge in violation of the whistleblower act and the Minnesota Occupational Safety and Health Act seeking only money damages

had a right to a jury trial, despite the fact that "these actions, created by statute, did not exist when the constitution was adopted." *Abraham,* 639 N.W.2d at 348, 354.

U.S. Steel argues that *Abraham* is distinguishable because the statutory claims mirrored the common law action for wrongful discharge recognized in *Phipps,* 408 N.W.2d at 571. This argument ignores two critical differences between the plaintiffs' claims under the whistleblower act in *Abraham* and the common law cause of action recognized in *Phipps.* First, while *Phipps* held that an employee has a cause of action for those employees who are "fired for their refusal to violate the law," *Phipps,* 408 N.W.2d at 571, the plaintiffs in *Abraham* alleged that they were terminated for *reporting* illegal activity in violation of Minn.Stat. § 181.932, subd. 1(a) (2000). *Abraham,* 639 N.W.2d at 346. Second, while the whistleblower act merely requires that the employee believes the employer is violating a federal or state law or rule, the common law action requires that the termination was a violation of clear public policy. *Compare Nelson v. Productive Alts., Inc.,* 715 N.W.2d 452, 456 (Minn.2006) (dismissing common law wrongful-discharge action because, while the employee was exercising his voting rights as a member of a nonprofit corporation, there was no clear public policy implicated by plaintiff's termination) *with Anderson–Johanningmeier v. Mid–Minn. Women's Ctr., Inc.,* 637 N.W.2d 270, 277 (Minn.2002) (holding that the whistleblower act contains no public policy requirement, requiring only a good faith belief that the employer is violating a state or federal law or rule).

Thus the cause of action in *Abraham* carried a constitutional right to a jury trial not because it was the codification of an existing common law cause of action—the

common law cause of action recognized in *Phipps* is materially different from a claim brought under the whistleblower act—the claim carried a constitutional right to a jury trial because it was legal in nature. *Abraham*, 639 N.W.2d at 354. The district court therefore erred by concluding that the right to a jury trial can only be conferred by the legislature whenever a cause of action is created by statute.

Second, the district court erred by relying on two previous cases holding that there is no right to a jury trial in actions brought pursuant to Minn.Stat. § 176.82, because both decisions relied upon the reasoning in *Breimhorst* that was rejected in *Abraham*. *See Snesrud*, 484 N.W.2d 423; *Flaherty v. Lindsay*, 457 N.W.2d 771 (Minn.App.1990), *rev'd on other grounds*, 467 N.W.2d 30 (Minn.1991). In *Snesrud*, this court held that there was no right to a jury trial for a retaliatory discharge claim under Minn.Stat. § 176.82 (1986) because there is no common law cause of action for wrongful discharge in retaliation for seeking workers' compensation benefits. *Snesrud*, 484 N.W.2d at 427 (holding that because the cause of action "depended on rights created by statute," it had "no element of a common law claim which could otherwise support the right to a jury trial") (quotation omitted). *Flaherty* held that there was no right to a jury trial for an intentional-obstruction-of-benefits claim brought under Minn.Stat. § 176.82 (1988) because the cause of action was created by statute, and the "[g]iving or withholding of a jury trial is a legislative prerogative where new rights and remedies are created which were unknown at common law." *Flaherty*, 457 N.W.2d at 775 (citing *Breimhorst*, 227 Minn. at 434, 35 N.W.2d at 734).

██ The reasoning underlying each case was explicitly rejected by *Abraham*. A cause of action need not exist at common law to confer an action, nor may the legis-

lature deny the constitutional right to jury trial when it creates a cause of action at law. *Abraham*, 639 N.W.2d at 354. The district court therefore erred by relying upon *Flaherty* and *Snesrud* rather than determining whether the nature of Schmitz's claims was legal or equitable.

Third, the district court distinguished *Abraham* because it did not relate to actions brought under the WCA, which, according to the district court, was "adopted specifically to remove the remedies and defenses that would otherwise be available under the common law from the employer/employee relationship." The remedy provided by the WCA for workplace injuries carries no constitutional right to a jury because it is "new, adequate, and fundamentally different from the common law cause of action" for workplace injuries. *Abraham*, 639 N.W.2d at 353. "The legislature took the cause of action [for workplace injuries] out of the district court and placed it in a quasi-judicial forum." *Id.*

██ But the mutual renunciation of common law causes of action and defenses under the WCA applies only to workplace-injury claims. *See* Minn.Stat. § 176.001. Claims brought under section 176.82, subdivision 1, are to be brought in a civil action in district court. Minn.Stat. § 176.82, subd. 1. Moreover, Minn.Stat. § 176.301, subd. 1, which prohibits workers' compensation cases from being heard by a jury, applies only to cases determining whether the worker is entitled to workers' compensation benefits. *Advanced Delivery Sys.*, 774 N.W.2d at 177. Thus while there is no right to a jury trial for employees seeking workers' compensation benefits, given the unique nature of the workers' compensation system, that same logic does not apply to claims brought under section 176.82, subdivision 1, which are brought in district court and are legal in nature, and therefore "fall[ ] within the

parameters of those 'cases at law' for which there is a constitutional right to jury trial." *Abraham*, 639 N.W.2d at 354.

For all the reasons stated above, we reiterate our conclusion that a claim for retaliatory discharge brought under Minn. Stat. § 176.82, subd. 1, seeking only money damages, is a cause of action at law carrying a constitutional right to a jury trial.[6] We therefore reverse the district court's judgment on Schmitz's retaliatory-discharge claim and remand for a jury trial on that cause of action.

Because Schmitz is entitled to a jury trial for his retaliatory-discharge claim, we need not address the remaining issues raised by U.S. Steel and Schmitz. Our granting a new trial renders Schmitz's second issue on cross-appeal moot, and similarly, the award of attorney fees will depend upon the outcome of the new trial.

### DECISION

Because Minn.Stat. § 176.82, subd. 1, provides a cause of action for threatening to discharge an employee for seeking workers' compensation benefits, and because the district court did not err in concluding that U.S. Steel violated the statute, we affirm the district court's judgment on that claim. Additionally, because Schmitz is entitled to a jury trial on his retaliatory-discharge claim under Minn. Stat. § 176.82, subd. 1, we reverse the district court's judgment on that claim and remand for a jury trial. However, because Schmitz is not entitled to a jury trial on his refusal-to-offer-continued-employment claim under Minn.Stat. § 176.82, subd. 2, we affirm the district court's judgment for U.S. Steel on that claim.

6. And we likewise reiterate our conclusion that the cause of action for refusal to offer continued employment brought under Minn.

**Affirmed in part, reversed in part, and remanded.**

Stat. § 176.82, subd. 2, is equitable in nature, with no attendant right to a jury trial.